IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| WEALTHMARK ADVISORS INCORPORATED, DAVID SHIELDS,<br><br>*Plaintiffs,*<br><br>vs.<br><br>PHOENIX LIFE INSURANCE COMPANY, PHL VARIABLE INSURANCE COMPANY,<br><br>*Defendants.* | §<br>§<br>§    SA-16-CA-00485-FB-ESC<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

## ORDER DENYING MOTION TO STRIKE DEFENDANT'S EXPERT WITNESS

Before the Court is the Motion to Strike Defendants' Expert Witness ("Motion") [#40] filed by Plaintiffs Wealthmark Advisors Incorporated and David Shields (collectively, "Plaintiffs" or "Wealthmark"). Pretrial matters have been referred to the undersigned pursuant to Western District of Texas Local Rule CV-72 and Appendix C [#21].[1] The district court has original jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1), and the undersigned has authority to enter this order pursuant to 28 U.S.C. § 636(b)(1)(A). *See, e.g., Target Strike, Inc. v. Marston & Marston, Inc.*, No. SA-10-cv-0188-OLG-NN, 2011 WL 676185, at *1 (W.D. Tex. Feb. 16, 2011) (noting that motions to exclude experts are non-dispositive).

Wealthmark moves to strike Charles F. McAleer, III, the expert witness for Defendants Phoenix Life Insurance Company and PHL Variable Insurance Company (collectively, "Defendants" or "Phoenix"). In their motion, Plaintiffs assert that (1) McAleer is not qualified to provide the opinions for which he was retained, and (2) McAleer does not set out verifiable

---

[1] The case was initially referred to Magistrate Judge Pamela Mathy on August 10, 2016 [#21], but was administratively reassigned to the undersigned's docket on January 17, 2017, upon Judge Mathy's retirement.

1

standards for his analysis, identify who created these standards, or explain their relevance. Alternatively, Wealthmark moves to exclude testimony by McAleer[2] regarding two of his conclusions as well as related to topics addressed in three different sections of his report, arguing that the expert's testimony is unsupported, constitutes impermissible personal beliefs, invades the province of the jury, and/or constitutes legal conclusions.

Having considered the Motion, Phoenix's Response [#41], the relevant law, and the pleadings, the Court DENIES the Motion [#40] except for the limited relief GRANTED herein. The Court declines to strike McAleer. In addition, the Court holds that McAleer is qualified to testify as an expert on independent marketing organizations ("IMOs") and regarding Wealthmark's compliance or lack of compliance with industry standards; such testimony is both relevant to this suit and reliable. Notwithstanding the foregoing, McAleer may not testify as to the meaning of legal terms, whether Wealthmark met its contractual obligations, any third party's state of mind, or whether any actions constitute violations of applicable law.[3]

## I.   BACKGROUND

In June 2010, Phoenix contracted with Wealthmark, an IMO, to market and sell Phoenix's insurance products. (*See* Annuity Distributor Agreement at Resp., Ex. 2.) Pursuant to the parties' agreement, Wealthmark agreed it would recruit Representatives, defined as "Producers and/or Subproducers" for contracting with Phoenix. (*Id.*) In addition to recruiting

---

[2] Plaintiffs also appear to argue that the Court should "strike" portions of the report. An expert report is not a pleading; it is hearsay and would not ordinarily be admissible. *See* Fed. R. Civ. P. 801(c); *Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363, 413 (N.D. Tex. 2016) ("Generally, expert reports are inadmissible hearsay because they are out-of-court statements offered to prove the truth of the matter asserted."). Thus, the Court declines to strike the report itself, and this Order addresses only whether the expert should be stricken or certain portions of his testimony excluded.

[3] Of course, in so far as a court or administrative agency reached such a legal conclusion, McAleer may testify regarding these facts.

Representatives, Wealthmark agreed to "cause and require" all of its Representatives to "comply with the Terms of this Agreement and all applicable state and federal laws." (*Id.*) Wealthmark further agreed that it would "make best efforts" to ensure its Representatives were aware of their obligation to ensure all sales were "appropriate and suitable for the needs of the insured" at the time of the sale in accordance with "Applicable Law governing suitability of insurance products." (*Id.*) In or around late 2011 or early 2012, Phoenix entered into a Producer Agreement with Anthony Friendshuh, a Minnesota licensed Resident Insurance Producer,[4] to sell its products in Minnesota in exchange for commissions on the sales. (*See* Defendants' Answer and Counterclaim [#3] ¶¶ 12-14.) It is Phoenix's position that Friendshuh became one of Wealthmark's Representatives, obligating Wealthmark to ensure that Friendshuh complied with all applicable laws and ensure that all sales were suitable to each customer's needs. (*Id.* ¶¶ 8, 15). Wealthmark concedes that it received commissions on Friendshuh's sales but contends that it relied upon Phoenix to vet Friendshuh's sales for both compliance and suitability. (*See* Original Third Party Complaint [#31] ¶ 7.)

In or around late 2013 and early 2014, the Minnesota Attorney General began conducting an investigation on Friendshuh based upon consumer complaints concerning Friendshuh's annuity sales practices. (*See* Compl. [#1-1] ¶ 18; Third Pty. Compl. ¶ 11.) In conjunction with this investigation, the State of Minnesota Commissioner of Commerce issued a Cease and Desist Order, finding that Friendshuh, among other things: (1) misrepresented the terms, benefits, or advantages of Phoenix annuity products; (2) made improper and unsuitable sales to Minnesota clients, which were not in his clients' best interest and which subjected his clients to surrender penalties; and (3) engaged in "fraudulent coercive or dishonest practices in connection with the

---

[4] Friendshuh's license was later revoked by the State of Minnesota.

insurance business," all in violation of Minnesota law. *In re Friendshuh*, 2014 WL 10293771, at *4 (Minn. Dep't of Commerce Dec. 5, 2014). The State of Minnesota and Phoenix thereafter entered into a court-approved settlement agreement, referred to as the "Assurance of Discontinuance," whereby Phoenix agreed to rescind approximately 211 annuities sold by Friendshuh to Minnesota citizens. (*See* Resp., Exs. 1, 3-4; *see also* Third Pty. Compl. ¶ 12.) Phoenix thereafter demanded that Wealthmark repay the commissions on Friendshuh's rescinded sales. (*See* Answ. ¶ 24; Compl. ¶ 18.)

In response to Phoenix's demand, Wealthmark filed suit in Bexar County District Court [#1-1], alleging that Phoenix was negligent in the way it handled the sales of its products in Minnesota. In its petition, Wealthmark also seeks a declaratory judgment that Phoenix is "not entitled to the return of any of the commissions paid to Wealthmark, nor of commissions paid to any of its representatives" because Phoenix allegedly "surrendered" the annuities more than twelve (12) months after the annuities were written and accepted and, pursuant to the parties' contract, no chargebacks on such paid commissions were due. Phoenix removed the case on the basis of diversity jurisdiction [#1] and counterclaimed for breach of contract [#3], alleging that Wealthmark is contractually obligated to return commissions paid to Wealthmark for the sale of the rescinded annuities and to indemnify Phoenix for all losses incurred in connection with the Assurance of Discontinuance.

On December 19, 2016, Phoenix designated McAleer as an expert to testify regarding industry standards related to IMOs, as well as whether Wealthmark complied or failed to comply with those standards. (*See* Resp., Ex. 5.) Wealthmark now moves to strike McAleer.[5]

---

[5] Plaintiffs failed to comply with Local Rule CV-7(i) because they did not include a certificate of conference and there is no indication Plaintiffs first conferred with Defendants in a good-faith attempt to resolve the matter by agreement. According to Defendants, no conference was ever

## II.     GOVERNING LAW

In *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993), the Supreme Court held that trial judges must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.  Subsequent to *Daubert*, Rule 702 of the Federal Rules of Evidence was amended to provide that a witness "qualified as an expert . . . may testify . . . in the form of an opinion . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  *See Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (quoting Fed. R. Evid. 702).  The Rule 702 and *Daubert* analysis applies to all proposed expert testimony, including nonscientific "technical analysis" and other "specialized knowledge."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

Under *Daubert*, expert testimony is admissible only if the proponent demonstrates that: (1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997).  The overarching focus of a *Daubert* inquiry is the "validity and thus evidentiary relevance and reliability of the principles that underlie a proposed submission."  *Watkins*, 121 F.3d at 989 (quoting *Daubert*, 509 U.S. at 594–96).  Because the *Daubert* test focuses on the underlying theory upon which the opinion is based, the proponent of expert testimony need not prove the expert's testimony is correct, but that the testimony is

---

attempted.  For this reason alone, the Court could deny the Motion without considering its merits.  *See* Local Rule CV-7(i).  Nevertheless, because the Court is mindful of its "special obligation" to act as a gatekeeper and exclude unreliable and irrelevant expert testimony, the Court will address the merits of Plaintiffs' Motion.  *See Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).  Plaintiffs are warned that failure to comply with this Court's Local Rules in the future may result in the imposition of appropriate sanctions.

reliable. *Moore*, 151 F.3d at 276. This determination of reliability includes a preliminary determination of "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

Notwithstanding the testing of an expert's qualification, reliability, and admissibility, "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Adv. Comm. Notes (2000). *Daubert* did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Id.* (quoting *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078 (5th Cir. 1996)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### III.   ANALYSIS

**A. McAleer is qualified to testify as an expert on IMOs and Wealthmark's compliance with industry standards.**

Wealthmark first challenges McAleer's qualifications to testify as an expert in this case. While Wealthmark acknowledges McAleer's extensive experience in the insurance and financial services industry, it contends that nothing in McAleer's resume shows "the particularized skill or knowledge that he may possess to giving the stated opinion for which he is retained." (*See* Motion ¶ 4.) Wealthmark, however, does not specify the skill or knowledge McAleer allegedly lacks.

Witnesses may be qualified as experts if they possess "specialized knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "The standard for qualifying expert witnesses is fairly liberal; the witness need not have specialized expertise in the area directly

pertinent to the issue in question if the witness has qualifications in the general field related to the subject matter in question." *Guzman v. Mem'l Hermann Hosp. Sys.*, No. CIV.A. H-07-3973, 2008 WL 5273713, at *15 (S.D. Tex. Dec. 17, 2008); *see also Surles ex rel. Johnson v. Greyhound Lines, Inc.,* 474 F.3d 288, 294 (6th Cir. 2007) (finding that it was of "little consequence to questions of admissibility" that expert lacked expertise in the very specialized area of commercial bus line threat assessment where expert's background and experience in law enforcement qualified him as an expert in the general field of threat assessment); *Smith v. BMW N. Am., Inc.*, 308 F.3d 913, 919 (8th Cir. 2002) (finding district court abused its discretion by excluding testimony of an expert witness qualified in a general field merely because that witness lacked expertise more specialized and more directly related to the issue at hand).

McAleer's resume [#40-1] reflects over forty years of experience in life and health insurance sales and marketing, including supervising IMO's and, McAleer's declaration [#41-7] elaborates upon these qualifications in great detail. Accordingly, the Court finds that McAleer's qualifications meet the "low threshold" set by *Daubert*. *DiSalvatore v. Foretravel, Inc.*, No. 9:14-CV-00150, 2016 WL 7742824, at *10 (E.D. Tex. Jul. 20, 2016) ("Rule 702 does not mandate that the expert be highly qualified in order to testify about a given issue, and the issue of qualification has been described as presenting a 'low threshold' for the proponent to clear."); *see also Kannankeril v. Terminix Int'l*, 128 F.3d 802, 809 (3d Cir. 1997) ("If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility.")

### B. McAleer has identified the industry standards upon which he relies, and his second conclusion is admissible.

Wealthmark next argues that all of McAleer's opinions (including specifically McAleer's second conclusion that Wealthmark did not comply with industry standards) are not reliable

because he fails to identify the industry standards, and "most importantly, who created them and why they should be relied upon by this court or a jury."  (*See* Motion ¶¶ 5, 7c.)  But McAleer in his report identifies several industry standards upon which he relies:

> (1) "IMOs must ensure that the products their representatives sell are compliant (good sales) with applicable laws and suitable for their clients."  (*See* McAleer Report [#41-1] at 4.)
>
> (2) IMOs are expected to provide proper oversight over their agents including monitoring the suitability of sales by implementing compliance and supervisory mechanisms and holding representatives accountable for violations of applicable law and industry practices.  (*Id.* at 5, 8-9.)
>
> (3) IMOs are expected to vet agents before submitting the agent to the carriers.  The purpose of this industry practice is to ensure that both the IMO and carriers are not exposed to potential risks in regards to agents "writing bad business and potentially causing substantial losses from chargebacks or losses."  (*Id.* at 4, 8.)
>
> (4) Due to the complexity of fixed annuities, as part of each sale, IMOs and their representatives are expected to provide a complete explanation of the features, benefits, and policy conditions of the annuities in a manner clients can understand.  (*Id.* at 6.)
>
> (5) IMOs are responsible for determining the suitability of client sales.  (*Id.* at 8).

Each of the foregoing is an industry standard.

McAleer also expressly provides the source of these industry standards in the opening paragraph of his report—his personal experiences in the financial services industry.  McAleer explains in his declaration that he further gained an understanding of "industry best standards" from his education and years serving on committees for the Life Insurance Marketing and Research Association ("LIMRA"), which adopts standards of performance and best practices to ensure that consumers are protected and companies are compliant.  (*See* [#41-7] ¶ 10-12.)

While an expert's testimony is often based upon scientific testing, the testimony can be based on personal experience as long as the expert "employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. 137, 150 (1999). The purpose of this requirement is to ensure that the expert's testimony is "reliable enough to present to a jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012).

McAleer's testimony is sufficiently reliable. To the extent Wealthmark disputes the accuracy or applicability of the industry standards described by McAleer, Wealthmark's recourse is to attack that testimony through cross-examination or rebut it with its own expert. McAleer's testimony regarding IMO industry standards would assist the trier of fact in determining whether Wealthmark failed to "cause and require" Friendshuh to comply with the parties' agreement and all applicable laws, including whether Wealthmark failed to ensure that all sales were "appropriate and suitable to the needs of the insured." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003) (to be relevant, an expert's proposed opinion must meet the relevancy requirement set forth in Rule 402 and assist the trier of fact to understand or determine a fact in issue). Accordingly, McAleer's second conclusion—that Wealthmark did not comply with industry standards with regard to its diligence and supervision of Friendshuh—is admissible. However, McAleer may not testify regarding any opinion as to whether Wealthmark breached the parties' agreement. *See Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) ("allowing an expert to give his opinion on legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant.")

### C. McAleer's first and third conclusions are admissible as well.

Wealthmark next attempts to preclude testimony regarding McAleer's first and third conclusions, arguing that these conclusions "do not even address these alleged standards, but merely give his unsupported opinions on the actions of Anthony Friendshuh, not yet a party in

9

the case, and on an ultimate issue of fact and law." (*See* Motion ¶ 6.) However, McAleer's first and third conclusions constitute his application of the above-referenced industry standards to the facts drawn from various documents including: findings from the Minnesota Commissioner of Commerce Cease and Desist Order, Phoenix's complaint files, the Minnesota Attorney General's Second Amended Complaint against Friendshuh, and the Assurance of Discontinuance. While Wealthmark may disagree with the facts upon which McAleer bases his analysis, the proper vehicle for Wealthmark to challenge McAleer's opinion is cross-examination. *Browning v. Sw. Research Inst.*, No. No. SA-05-CA-0245-FB, 2006 WL 6549921, at *2 (W.D. Tex. Aug. 17, 2006) (quoting *Hartley v. Dillards, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002)) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.") Finally, McAleer's first and third opinions do not contain legal conclusions and, contrary to Wealthmark's contentions, an expert's opinion is not inadmissible simply because it embraces an ultimate issue of fact. *See* Fed. R. Evid. 704(a).

### D.  Testimony reflecting legal conclusions and speculation are impermissible.

Wealthmark next seeks to exclude testimony by McAleer related to topics in his report entitled "Marketing Organizations," "Bilateral Duties and Responsibilities," and "Observations and Opinions." The Court disagrees that the majority of this testimony must be excluded; however, McAleer may not testify as to legal conclusions or speculate as to another person's state of mind.

The "Marketing Organizations" section of McAleer's report sets forth the historical reason for the rise of IMOs and their role in the insurance industry. Wealthmark objects that this section contains "unsubstantiated opinions and personal beliefs" and "[a]t times he even admits

that they are based on speculation by using the actual term 'speculation.'" (*See* Motion ¶ 7a.) However, as discussed above, McAleer's opinions are based upon his extensive personal experience in the industry. While McAleer notes in one sentence that "[t]here is speculation why general agents and agents gravitate to producer groups," the context of this statement reveals that McAleer was simply referring to the fact that there are differing views on this issue. McAleer's next sentence explains the five reasons LIMRA has found producers join a group. Again, Wealthmark's recourse here is cross examination.

The "Bilateral Duties and Responsibilities" section of McAleer's report discusses typical IMO agreements and industry standards. Again, Wealthmark objects to the content of this section as "unsupported" and complains that it merely sets out McAleer's personal beliefs and opinions. (*See* Motion ¶7b.) However, as previously, explained nothing within Rule 704 prevents an expert from providing opinions based upon personal experiences, and McAleer has explained the source for his opinions. Accordingly, the Court declines to exclude this testimony. However, in this section, McAleer also provides the legal definition of a contract. Such testimony is impermissible. *Blythe v. Bumbo Int'l Trust*, No. 6:12-CV-36, 2013 WL 6190284, at *3 (S.D. Tex. Nov. 26, 2013), *aff'd* 634 F. App'x 944 (5th Cir. 2015) (quoting *Specht v. Jensen*, 853 F.2d 805, 810 (10th Cir. 1988) ("[W]hen the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed. In no instance can a witness be permitted to define the law of the case.") McAleer may not testify regarding the meaning of legal terms.

Finally, in the "Opinions and Observations" section of the report, McAleer discusses industry standards, the allegations surrounding Friendshuh's business practices, and Wealthmark's violation of industry standards in failing to properly supervise Friendshuh.

Wealthmark moves to exclude testimony on the grounds that "any observations and/or opinions regarding the behavior of Friendshuh are beyond the scope of his [McAleer's] admitted engagement," and such opinions "invade the province of the trier of fact and represent legal conclusions." (*See* Motion ¶ 7c.) In his report, McAleer explains that he has been engaged by Phoenix "to provide expert opinions in this case concerning industry standards related to IMOs and WealthMark Advisor's (WMA) compliance or lack of compliance with those standards." (*See* McAleer Report at 2.) McAleer opines in his report that Wealthmark failed to comply with industry standards because it failed to properly supervise Friendshuh's sales. Accordingly, Friendshuh's activities are directly relevant to McAleer's engagement and, the Court finds that these opinions would assist the jury. Notwithstanding the foregoing, McAleer may not opine as to legal conclusions. Thus, McAleer may not testify regarding any opinion that Wealthmark failed to comply with its contractual obligations. Further, McAleer cannot testify regarding his opinions about whether Wealthmark violated applicable law. In addition, McAleer, of course, may not opine on any third party's state of mind.[6]

## IV.   CONCLUSION

For the reasons set forth above, Plaintiff's Motion to Strike Defendants' Expert Witness [#40] is **DENIED** except for the limited relief **GRANTED** herein. McAleer is generally permitted to testify as to the conclusions in his report and the bases for those conclusions, with the following limitations:

(1) McAleer cannot testify as to the meaning of legal terms;

---

[6] For example, McAleer opines that "Friendshuh views carrier mandated education and training unnecessary" and that one of Wealthmark's employees engaged in a "deliberate act to circumvent PHL's training and education requirements." (*See* McAleer Report at 6.) Such testimony constitutes improper speculation and is inadmissible.

(2) McAleer cannot opine whether Wealthmark breached the parties' agreement or violated any applicable laws; and

(3) McAleer cannot testify regarding any third party's state of mind.

SIGNED this 24th day of March, 2017.

_____
ELIZABETH S. ("BETSY") CHESTNEY
U.S. MAGISTRATE JUDGE