IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| WEALTHMARK ADVISORS INCORPORATED, DAVID SHIELDS, | § § § § § § § § § § § § § | SA-16-CA-00485-FB-ESC |
| *Plaintiffs,* | | |
| vs. | | |
| PHOENIX LIFE INSURANCE COMPANY, PHL VARIABLE INSURANCE COMPANY, | | |
| *Defendants.* | | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns the Motion for Partial Summary Judgment ("Motion") [#44] filed by Defendants Phoenix Life Insurance and PHL Variable Insurance Company (together, "Defendants" or "Phoenix") and the Opposed Motion for Leave to Supplement Response to Defendants' Motion for Partial Summary Judgment [#64] filed by Plaintiffs Wealthmark Advisors Incorporated and David Shields (together, "Plaintiffs" or "Wealthmark"). Pretrial matters have been referred to the undersigned pursuant to Western District of Texas Local Rule CV-72 and Appendix C [#21].[1] The district court has original jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1). The undersigned has authority to enter a recommendation regarding the summary judgment motion pursuant to 28 U.S.C. § 636(b)(1)(B) and to dispose of the motion for leave pursuant to 28 U.S.C. § 636(b)(1)(A).

---

[1] The case was initially referred to Magistrate Judge Pamela Mathy on August 10, 2016 [#21], but was administratively reassigned to the undersigned's docket on January 17, 2017, after Judge Mathy's retirement.

1

After considering Defendants' Motion [#44], the Response filed by Wealthmark [#56][2], Defendants' Reply [#59], the case file, and the relevant law, the undersigned recommends that the District Court **GRANT** Defendants' Motion for Partial Summary Judgment [#44]. In addition, the undersigned **GRANTS** Plaintiffs' Opposed Motion for Leave to Supplement Response to Defendants' Motion for Partial Summary Judgment [#64], [3] but the supplemental evidence submitted by Plaintiffs had no impact on the undersigned's analysis of Defendants' summary judgment motion.

## I. FACTS SUPPORTED BY THE RECORD

This is a contract dispute between Phoenix and Wealthmark, as well as Anthony Friendshuh, a Wealthmark Representative who sold Phoenix insurance products. In June 2010, Phoenix contracted with Wealthmark to market and sell Phoenix's insurance products. (*See* Ex. 11 to Motion.) Pursuant to the parties' Annuity Distributor Agreement ("Distributor

---

[2] In its Response, Wealthmark also requests that the Court grant it summary judgment on its claim for declaratory relief. (*See* Response at 2, 6.) Wealthmark previously filed a motion for summary judgment asking the Court for the same relief, which was denied [#23, #26]. Since that denial, Wealthmark has not renewed or filed another summary judgment motion, and none is pending before the Court. An argument in a response does not constitute a cross motion for summary judgment. *See, e.g., Burgess v. Daniels*, No. 13-CV-02191-PAB-CBS, 2014 WL 4698773, at *12 n. 5 (D. Colo. Sept. 22, 2014) (noting that "it is procedurally improper to request affirmative relief in a response brief"); *Summit Towers Condo. Ass'n, Inc. v. QBE Ins. Corp.*, No. 11-60601-CIV, 2012 WL 12840822, at *4 (S.D. Fla. Apr. 30, 2012) (noting that "[m]ost of the issues raised by [plaintiff] would be appropriate if it had filed its own motion for summary judgment, but are procedurally improper when included in a response brief to [defendant's] motion for summary judgment").

[3] In their motion [#64], Plaintiffs seek leave to supplement the summary judgment record with deposition testimony from Defendants' corporate representative, Nancy Turner. In these deposition excerpts, Ms. Turner responded to inquiries regarding Phoenix's intent in using certain words in a settlement agreement between Phoenix and the State of Minnesota. This testimony is extrinsic evidence that can play no role in the undersigned's interpretation of the unambiguous terms in the contract at issue. *See Tex. v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) ("Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity.")

Agreement"), Wealthmark (the "Distributor") agreed it would recruit Representatives (also referred to as "Sub-producers") for contracting with Phoenix. (*Id.* at 3.) In addition to recruiting Representatives, Wealthmark agreed to "cause and require" all of its Representatives to "comply with the Terms of this Agreement and all applicable state and federal laws." (*Id.* at 4.) Wealthmark further agreed that it would "make best efforts" to ensure its Representatives were aware of their obligation to ensure all sales were "appropriate for and suitable to the needs of the insured" at the time of the sale in accordance with "[a]pplicable Law governing suitability of insurance products." (*Id.* at 3.) Wealthmark agreed to be responsible for all expenses incurred and to indemnify Phoenix from "all losses, expenses, costs, damages and liability resulting from negligent acts by Distributor or its Sub-producers, and from acts or transactions by any of them not authorized by Phoenix." (*Id.* at 4.)

In exchange, Phoenix agreed to compensate Wealthmark according to the Compensation Schedules attached to the Distributor Agreement, subject to a Repayment-of-Commissions provision, which required Wealthmark to repay earned commissions under certain circumstances. (*Id.*)

In June 2011, Phoenix entered into a Producer Agreement with one of Wealthmark's Representatives, Anthony Friendshuh (the "Producer"), a Minnesota licensed Resident Insurance Producer, to sell its products in Minnesota in exchange for commissions on the sales. (*See* Ex. 2 to Resp. & Ex. 10 ¶ 2 to Motion.)

On or about February 3, 2014, the Minnesota Attorney General filed suit on behalf of the State of Minnesota against Friendshuh in the Fourth Judicial District of Hennepin County captioned *State of Minnesota by its Attorney General, Lori Swanson v. Heritage Partners, LLC et al.*, No. 27-14-1563. (*See* Ex. 1 ¶ 2 to Motion.) In this suit, the State of Minnesota alleged

that Friendshuh sold annuities to Minnesota seniors and those approaching retirement, some of which were allegedly unsuitable or not fully or accurately described. (*Id.; see also* Ex. 3 at 2 to Motion.) The State of Minnesota's Commissioner of Commerce thereafter issued a Cease and Desist Order, alleging that Friendshuh violated Minnesota law in several different ways including by: (1) misrepresenting the terms, benefits, or advantages of Phoenix annuity products; (2) making improper and unsuitable sales to Minnesota clients that were not in his clients' best interest, subjecting his clients to surrender penalties and additional years of surrender charges; (3) engaging in "fraudulent coercive or dishonest practices in connection with the insurance business"; and (4) failing to make reasonable inquiries to determine suitability when recommending the purchase of annuities. *See In re Friendshuh*, 2014 WL 10293771, at *4 (Minn. Dep't of Commerce Dec. 5, 2014).

In conjunction with its investigation into Friendshuh's fraudulent practices, the State of Minnesota served a Civil Investigative Demand on Phoenix. (*See* Ex. 3 at 2 to Motion.) Phoenix and the State of Minnesota then entered into a court-approved settlement agreement, the "Assurance of Discontinuance." (*Id.; see also* Ex. 1 ¶ 3 to Motion.) The Assurance of Discontinuance established a claims-review process allowing any affected Minnesota consumer to request cancellation of his or her Phoenix annuity with full repayment of the premium if the sale was unsuitable under Minnesota law at the time of the application, or if the sale resulted from a material misrepresentation of the terms or conditions of the annuity.[4] (Ex. 3 at 3-8 to Motion.) Policyholders who had already surrendered their annuities prior to the Assurance of Discontinuance or who had previously received rescissions from Phoenix were provided the

---

[4] The parties vehemently dispute the form of relief provided by the Assurance of Discontinuance. Phoenix argues that the Assurance of Discontinuance contemplated rescission of the affected annuities and that rescission actually occurred. Wealthmark, on the other hand, argues that the Assurance of Discontinuance allowed consumers to surrender—not rescind— their annuities.

4

opportunity to file a claim to recover additional relief in the form of surrender charges or fees. (*Id.* at 6 ¶¶ 5-6.)

Policyholders whose requests for rescission were approved received offers of rescission with payments calculated as the full amount of the premium paid by the policyholder into the annuity over the life of the contract (less any amount paid by Phoenix to the Policyholder under the annuity contract), plus 3.5% interest. (*Id.* at 4 ¶ 3.) Phoenix was expressly prohibited from imposing withdrawal or surrender charges or fees on annuity contracts rescinded pursuant to the Assurance of Discontinuance. (*Id.*) Policyholders who accepted Phoenix's rescission offers executed a Settlement Agreement and Release with Phoenix, in the form of Exhibit E to the Assurance of Discontinuance. (*Id.* at 25 -26.)[5] Pursuant to these Settlement Agreements, Phoenix agreed to "rescind" the annuity issued to the policyholder executing the agreement, and the annuity was "deemed surrendered, terminated, null, void, and without force and effect as of that date." (*Id.* at 25 ¶ 1.)

Pursuant to Assurance of Discontinuance, and following the claims-review process it established, Phoenix cancelled 222 annuities, returning all premiums plus interest to the affected policyholders. (Ex. 10 ¶ 3 to Motion.) Phoenix also provided additional relief on 12 annuities that were rescinded prior to Phoenix entering the Assurance of Discontinuance with the State of Minnesota, and other relief on 14 annuities that were not rescinded. (*Id.*) In total, pursuant to the terms of the Assurance of Discontinuance, Phoenix returned $23,015,074.57 in premiums and $3,047,538.68 in interest to policyholders. (*Id.*) Both Wealthmark and Friendshuh had

---

[5] Policyholders whose annuities had been rescinded prior to the Assurance of Discontinuance executed a separate Settlement and Release Agreement, attached as Exhibit F to the Assurance of Discontinuance. (*Id*. at 27-28.)

5

received commissions on these sales, prior to their cancellation pursuant to the Assurance of Discontinuance. (*Id.*)

On or about February 4, 2016, Phoenix served a demand letter upon Friendshuh for a return of commissions it contends he owed pursuant to the Repayment-of-Commissions provision of his contract with Phoenix. (*See* Ex. 4 to Motion; Ex 1 ¶ 4 to Motion.) Approximately one month later, because Friendshuh failed to respond to the demand, Phoenix served a demand letter upon Wealthmark, demanding that Wealthmark repay commissions paid to both Wealthmark and Friendshuh on all of the rescinded annuities pursuant to the Repayment-of-Commissions and indemnity provisions in the parties' Distributor Agreement. (*See* Ex. 5 to Motion; Ex. 1 ¶ 5 to Motion.) In the demand, Phoenix also notified Wealthmark that unless it could collect the commissions from Friendshuh within thirty days, Phoenix would exercise its right to transfer the indebtedness to Wealthmark. (Ex. 5 to Motion.) On May 27, 2016, Phoenix notified Wealthmark that it had been unsuccessful in its attempt to collect the debt directly from Friendshuh and was therefore exercising its rights to transfer the debt to Wealthmark. (Ex. 6 to Motion.) Phoenix then demanded that Wealthmark satisfy its unpaid debt as well as the transferred Friendshuh debt. (*Id.*)

Rather than respond directly to Phoenix's demands, Wealthmark filed suit in Bexar County District Court [#1-1], alleging that Phoenix negligently handled the sales of its products in Minnesota. Wealthmark also sought a declaratory judgment that Phoenix is not entitled to repayment of the commissions on the annuities at issue because Phoenix allegedly "surrendered" the annuities more than twelve (12) months after issuance. Phoenix removed the case on the basis of diversity jurisdiction [#1] and counterclaimed for breach of contract [#3], alleging that Wealthmark breached the Distributor Agreement in the following ways: (1) failing to repay the

6

commissions earned on the annuities affected by the Assurance of Discontinuance; (2) failing to pay Phoenix on Friendshuh's transferred debt; (3) failing to ensure Friendshuh's compliance with applicable law concerning annuity sales; and (4) failing to indemnify Phoenix for all losses it incurred on the annuities sold by Friendshuh. On October 17, 2016, Wealthmark filed a third-party complaint against Friendshuh for breach of contract and for indemnity and contribution. Wealthmark seeks to recover from Friendshuh any and all sums awarded to Phoenix against Wealthmark in this litigation to the extent that Friendshuh was in whole or in part responsible for such damages [#31]. To date, neither Friendshuh nor Wealthmark has repaid any commissions on the annuities rescinded pursuant to the Assurance of Discontinuance. (*See* Ex. 10 ¶ 3 to Motion.)

Phoenix's Motion does not address all of the claims described in the previous paragraph. Instead, Phoenix is only requesting summary judgment on the following issues: (1) Wealthmark is not entitled to a declaratory judgment that is not required to repay the commissions affected by the Assurance of Discontinuance; (2) Phoenix is entitled to summary judgment that Wealthmark breached the Repayment-of-Commissions provision in the Distributor Agreement; (3) Phoenix is entitled to summary judgment on Wealthmark's negligence claim because it is barred by the economic loss doctrine; and (4) Phoenix is entitled to summary judgment that Wealthmark cannot recover for reputational harm on a negligence claim.

## II. <u>Summary Judgment Standard</u>

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *see also* FED. R. CIV. P. 56(c). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Catrett*, 477 U.S. at 323. Once the movant carries its burden, the burden shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wise v. E.I. Dupont de Nemours & Co.*, 58 F.3d 193, 195 (5th Cir. 1995). The non-movant must respond to the motion by setting forth particular facts indicating that there is a genuine issue for trial. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The Court will view the summary judgment evidence in the light most favorable to the non-movant. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

"After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Westphal*, 230 F.3d at 174. However, if the party moving for summary judgment fails to satisfy its initial burden of demonstrating the absence of a genuine issue of material fact, the motion must be denied, regardless of the nonmovant's response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). A party can move for summary judgment on a part of a claim or defense or on a certain issue of law. *Norton v. Assisted Living Concepts, Inc.*, 786 F. Supp. 2d, 1173, 1187 (E.D. Tex. 2011). The award of a partial summary judgment is a ruling

that certain issues are deemed established for trial. *FDIC v. Massingill*, 24 F.3d 768, 774 (5th Cir. 1994), *supplemented*, 30 F.3d 601 (5th Cir. 1994).

### III. Analysis

The District Court should grant Phoenix's motion for partial summary judgment. First, Phoenix has proved the breach element of its counterclaim as a matter of law (and defeated Wealthmark's request for declaratory relief) because Phoenix rescinded—and did not surrender— the annuities at issue in this case and, therefore, Wealthmark breached unambiguous terms in the Repayment-of Commissions provision. Phoenix is also entitled to summary judgment on Wealthmark's negligence claim because it has proved as matter of law that the economic loss doctrine precludes any negligence claim that arises out of the contractual duties between the parties, and Wealthmark has not provided any authority or evidence to support an argument that the duty it is alleging Phoenix violated had its origin in anything other than contract.

**A. Wealthmark breached the Repayment-of-Commissions provision as a matter of law.**

Phoenix seeks summary judgment on Wealthmark's request for a declaratory judgment that Phoenix is not entitled to the return of any commissions. The flip side of the same coin, Phoenix also seeks partial summary judgment as to liability on its breach of contract counterclaim, arguing that Wealthmark is contractually obligated under the Repayment-of-Commissions provision of the Distributor Agreement to repay commissions on all annuities affected by the Assurance of Discontinuance. Wealthmark opposes summary judgment, arguing that the words "deemed surrendered" contained in Exhibit E to the Assurance of Discontinuance reveal that the annuities at issue were "surrendered"—not rescinded—and therefore Wealthmark

9

is absolved of all liability pursuant to footnote (e) in the Compensation Schedules in the Distributor Agreement.

Both Wealthmark's request for declaratory judgment and Phoenix's breach of contract counterclaim require the Court to interpret the same contracts. Under Texas law[6], "the burden of proof in a declaratory judgment [action] . . . is not controlled by the position of the parties on the docket as plaintiff or defendant." *Singh v. Bajwa*, No. CIV.A.3:08-CV-0383-D, 2008 WL 3850545, at *1 (N.D. Tex. Aug. 19, 2008) (quoting *Harkins v. Crews*, 907 S.W.2d 51, 58 (Tex. App.—San Antonio 1995, writ denied)). Rather, "the party asserting the affirmative of the controlling issues [is the one who] bears the burden." *Id.* (quoting *Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n*, 252 S.W.3d 605, 625-26 (Tex. App.—Austin 2008, pet. filed)). Because Phoenix is the party asserting the claim for breach of contract, it bears the burden at trial and on summary judgment of proving the existence of each element of its breach of contract counterclaim as a matter of law. *Id.*

The elements of a breach of contract claim are (1) the existence of a valid contract; (2) performance or tendered performance by the party asserting the claim; (3) breach of the contract by the party against whom the claim is brought; and (4) damages sustained as a result of the breach. *Smith Int'l Inc. v. Egle Grp., LLC,* 490 F.3d 380, 387 (5th Cir. 2007) (citing *Valero Mktg. & Supply Co. v. Kalama Int'l, L.L.C.*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st] 2001, no pet.)). The parties do not dispute that the Distributor Agreement is a valid contract, that Phoenix tendered performance in the form of commissions on sales, or that Phoenix sustained

---

[6] Because this is a diversity case, the Court must look to Texas law to determine who has the burden of affirmatively proving or disproving the claims in this case. *See Ideal Mut. Ins. Co. v. Last Days Evangelical Ass'n*, 783 F.2d 1234, 1240 (5th Cir. 1986) (holding that the issue of burden proof is substantive rather than procedural and is therefore governed by the forum state's law).

some amount of damages *if* Wealthmark breached the contract. (*See* Resp. at 2 ¶ 3, at 5 ¶ 2; Ex. 10 ¶ 3 to Motion.) Accordingly, the sole issue is whether Wealthmark breached the Repayment-of-Commissions provision of the Distributor Agreement by failing to repay the commissions Wealthmark and Friendshuh had been paid for the annuities cancelled pursuant to the Assurance of Discontinuance. If the terms of the contracts are plain and unambiguous, the construction of the contracts and its legal effect are questions of law that the Court can decide on summary judgment. *See Phillips v. Union Bankers Ins. Co.*, 812 S.W.2d 616, 618 (Tex. App.—Dallas 1991, no writ).

### 1. The Distributor Agreement

The Repayment-of-Commissions provision of the Distributor Agreement unambiguously requires repayment of rescinded annuities. In construing a written contract, a court seeks to ascertain the "true intent" of the parties as expressed in the instrument. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995*); Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). To determine the parties' "true intent," courts must, applying rules of contract construction and interpretation, first determine whether there is any ambiguity in the contract. *Gulf Ins. Co. v. Burns Motors, Inc.,* 22 S.W.3d 417, 423 (Tex. 2000); *DeWitt Cty. Elec. Coop. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999). If a contract can be given a "certain or definite legal meaning or interpretation," then it is unambiguous, and the court will construe the contract as a matter of law, looking only to the "four corners" of the agreement. *Barnard Const. Co., Inc. v. City of Lubbock*, 457 F.3d 425, 428 (5th Cir. 2006); *Tex. v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006). Where a contract is unambiguous, extrinsic evidence—evidence submitted for the purpose of showing what the parties intended—is inadmissible to contradict, vary, or add to the terms the contract. *Am. Tobacco*, 463 F.3d at 407; *In re H.E. Butt Grocery Co.*, 17 S.W.3d 360, 369 (Tex. App.—Houston [14th Dist.] 2000, orig. proceeding).

The Repayment-of-Commissions provision unambiguously requires Wealthmark to promptly repay all compensation (including commissions) paid by Phoenix (whether or not Wealthmark paid a portion of the compensation to its Representative or Sub-producer), under various different circumstances, including "[s]hould Phoenix for any reason refund or return any amount of any premium payment made on a Phoenix Product." (*See* Ex. 11 to Motion at 8-9.) This same provision permits Phoenix to transfer to Wealthmark any indebtedness owed by Wealthmark's Representatives "due to cancellation, refunds or any other adjustments or charges against [the] Representative's commissions," provided Phoenix first attempts to collect the amount due directly from the Representative. (*Id.*) But the Repayment-of-Commissions provision is explicitly contingent on the Compensation Schedules. Pursuant to footnote (e) of the Compensation Schedules, Wealthmark is not obligated to return 100% of commissions earned on contracts "full[y] or partial[ly] *__surrender__*[ed]" more than six months after issuance. (*Id.* at 12) (emphasis added). Instead, Wealthmark is subject to a "50% charge back . . . upon a full or partial surrender of the contract in months 7-12." (*Id.*)[7]

Thus, Phoenix is entitled to summary judgment on Wealthmark's request for declaratory judgment and partial summary judgment on the liability portion[8] of its breach of contract counterclaim if: (1) it has proved that no genuine issue of material fact exists that it refunded or returned any amount of any premium payment made on the annuities affected by the Assurance of Discontinuance, **and** (2) that the refunds did not constitute surrenders.

---

[7] The contract does not explicitly address whether Wealthmark must repay any portion of the commissions where the contract is surrendered more than twelve months after issuance. Although Wealthmark's position is that no repayment is due under such circumstances, the Court need not reach this issue for purposes of this report and recommendation.

[8] The amount of damages caused by this breach is a fact issue Phoenix intends to raise at trial. (*See* Motion at 2.)

## 2. The Assurance of Discontinuance

The Assurance of Discontinuance unambiguously requires rescission—not surrender—of the affected annuities. The Assurance of Discontinuance unambiguously refers to Phoenix's obligation to rescind annuities that were the result of unsuitable sales or that resulted from a material misrepresentation, upon the policyholder's request. In fact, the Assurance of Discontinuance uses the term "rescind" (or some variation thereof) nearly twenty different times. Rescission "puts an end to a contract . . . plac[ing] the parties in the position that they would have occupied if no such contract had ever been made." *In re SeaQuest Diving, LP*, 579 F.3d 411, 419 (5th Cir. 2009). Thus, pursuant to the Repayment-of-Commissions provision of the Distributor Agreement, Wealthmark was contractually obligated to promptly repay all compensation (including commissions) paid by Phoenix for these rescinded annuities.

Wealthmark, however, claims it is not liable to repay the commissions, focusing on the single use of the term "surrendered" in the Settlement and Release Agreement, attached as Exhibit E to the Assurance of Discontinuance. (Resp. at 3-4.) According to Wealthmark, this language reveals that the annuities cancelled pursuant to the Settlement and Release Agreement were "surrendered" as opposed to rescinded. Citing footnote (e) in the Compensation Schedule, Wealthmark argues that it has no obligation to repay commissions on annuities surrendered more than twelve months after issuance. Wealthmark's position is not persuasive.

First, Wealthmark urges the Court to give controlling effect to two words, "deemed surrendered," and to take them out of context, which would violate basic rules of contract construction. In construing an unambiguous contract such as the Assurance of Discontinuance, "courts should examine and consider the *entire writing* in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Coker*, 650

13

S.W.2d at 393 (emphasis in original). In other words, "[n]o single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Id. see also Calpine Producer Servs., L.P. v. Wiser Oil Co.,* 169 S.W.3d 783, 787 (Tex. App.—Dallas 2005, no pet.) (pursuant to the "Four Corners Rule," "the intention of the parties is to be ascertained from the instrument as a whole and not from isolated parts thereof.") Further, "[i]n harmonizing these provisions, terms stated earlier in an agreement must be favored over subsequent terms." *Coker,* 650 S.W.3d at 393.

Wealthmark fails to explain how its construction of the two-word phrase could be harmonized with the Assurance of Discontinuance's repeated use of the terms "rescind" and "rescission." Rescission and surrender are distinct legal concepts. Although both rescission and surrender result in a contract's termination, rescission results in restoring both parties to the *status quo* (i.e., return of all premiums along with interest without the imposition of fees) whereas surrender simply entitles a party to the cash surrender value of the policy. *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 855 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (citing *Sid Richardson Carbon & Gasoline Co. v. Interenergy Res., Ltd*., 99 F.3d 746, 754 (5th Cir. 1996) ("Under Texas law, parties may mutually agree to 'rescind' a contract, restoring the *status quo ante*.")); *Green v. Am. Nat'l Ins. Co*., 452 S.W.2d 1, 3, (Tex. Civ. App.—San Antonio 1970, no writ). In fact, even if Phoenix had never entered the Assurance of Discontinuance, its policyholders were contractually permitted to unilaterally surrender their annuity contracts upon written request in exchange for a "Cash Surrender Value" calculated as the annuity's Accumulation Value adjusted by any applicable Market Value Adjustment less the applicable surrender charges and taxes. (*See* Ex. 10 ¶ 4 and Ex. 12 at 5 to Motion.) Wealthmark's

proposed construction therefore means that the policyholders would have gained no rights under the Assurance of Discontinuance that they did not already have.

It is possible to harmonize "deemed surrendered" with the other terms of the Assurance of Discontinuance. "Surrendered" does not stand alone; it is qualified by the word "deemed." The best reading of the phrase "deemed surrendered" in context of the rest of the contract is that if the policyholder accepts the rescission, the annuity would be regarded as surrendered so that the policyholder would have no continuing rights in the annuity, *including the right to surrender for cash value*. "Deemed surrendered" is followed by the words "terminated, null, void, and without force and effect," which clarifies the effect of the rescission—cancellation of the annuity policies.

3. **The language in the Settlement and Release Agreement does not transform Phoenix's rescission of the annuities into surrenders.**

Moreover, the uncontroverted evidence in the summary judgment record indicates that Phoenix, in fact, rescinded 234 annuities. (*See* Ex. 10 ¶ 3 to Motion.) Therefore, even if the contract could be construed to permit the policyholders to surrender or rescind their annuities, they did not. Because the annuities were rescinded, pursuant to the Repayment-of-Commissions provision of the Distributor Agreement, Wealthmark is obligated to repay the commissions.

**B. Wealthmark's claim for negligence is barred by the economic-loss doctrine.**

Phoenix is entitled to summary judgment on Wealthmark's claim for negligence, which is barred by the economic-loss doctrine. The "economic loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014). But the rule "does not bar all tort claims arising out of a contractual setting." *Id.* "Thus, a party states a tort claim when the

duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely the economic loss of a contractual benefit." *Id.* (economic-loss rule did not bar suit against plumber because the plumber's duty not to damage the house was independent of any obligation undertaken in his plumbing subcontract with the builder, and the damages allegedly caused by the breach of that duty extended beyond the economic loss of any anticipated benefit under the plumbing contract).

The gravamen of Wealthmark's negligence claim against Phoenix is that Phoenix negligently handled the sale of its own products in Minnesota in terms of how the company interacted with and managed its relationship with Friendshuh. (Compl. ¶ 23; Resp. at 5.) The damages Wealthmark seeks for this negligence claim include lost revenue and reimbursement for expenses, costs incurred in marketing and promoting Phoenix products, damages for reputational harm[9], and punitive damages. (Ex. 7 at 4 to Motion & Ex. 8 at 4 to Motion.)

The Distributor Agreement governs the parties' rights and obligations with respect to sales of Phoenix's products by Wealthmark and any of its Representatives (including Friendshuh). To the extent Wealthmark alleges that it was harmed by Phoenix's breach of the contractual obligations the Distributor Agreement imposes on Phoenix, the economic-loss rule bars Wealthmark's negligence claim for economic damages. Neither Plaintiffs' live pleading nor their response to Defendants' summary judgment motion identifies any non-contractual duty that Phoenix owed Plaintiffs. Although Wealthmark argues, in general terms, that Phoenix owed

---

[9] Wealthmark contends that it suffered reputational harm in the insurance community from being associated with a company whose alleged practices led to an attorney general investigation and the return of millions of dollars in premiums. (*See* Compl. ¶¶ 19-23.) Phoenix has moved for partial summary judgment on this issue, arguing that reputational damages are not a recoverable on claims for negligence. Because the undersigned recommends that the District Court grant summary judgment on Wealthmark's negligence claim, it need not reach Phoenix's argument that damages for reputational harm are never recoverable on a negligence claim.

16

other duties, Wealthmark has failed to identify any specific statutory, common-law, or other source of such a duty. Indeed, Wealthmark admits that the only other duty governing the sale of Phoenix's products in Minnesota and Phoenix's interactions with Friendshuh is set forth in *another contract*—the Producer Agreement— executed by Phoenix and Friendshuh. (*See* Resp. at 5 ¶ 3.)

This is not a situation where Phoenix's conduct—the allegedly negligent mishandling of its relationship with a sales representative—could have resulted in its liability to Wealthmark even in the absence of a contractual relationship between Phoenix and Wealthmark. *Cf. Sw. Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 494 (Tex. 1991) ("If the defendant's conduct—such as negligently burning down a house—would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. Conversely, if the defendant's conduct—such as failing to publish an advertisement—would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract."); *see also Chapman*, 224 S.W.3d at 718 (citing *DeLanney* with approval for its reasoning). Here, the only duties that Phoenix owes Wealthmark would arise out of the parties' contractual relationship. Thus, Defendants are entitled to summary judgment on Wealthmark's negligence claim pursuant to the economic-loss rule.

### IV. Conclusion

For the reasons discussed above, the undersigned recommends that the District Court **GRANT** Phoenix's Motion for Partial Summary Judgment [#44] as follows:

> (1) Phoenix should be granted partial summary judgment on its breach of contract counterclaim for the return of commissions pursuant to the Repayment-of-

Commissions provision of the Distributor Agreement, and the amount of damages owed for the breach is an issue of fact reserved for trial;

(2) Phoenix should be granted summary judgment that Wealthmark's request for a declaratory judgment is denied; and,

(3) Phoenix should be granted summary judgment on Wealthmark's negligence claim.

**IT IS FURTHER ORDERED** that Plaintiffs' Opposed Motion for Leave to Supplement Response to Defendants' Motion for Partial Summary Judgment [#64] is **GRANTED**.

## V. Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). The party shall file the objections with the clerk of the court, and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections. A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations

contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

SIGNED this 15th day of August, 2017.

_____
ELIZABETH S. ("BETSY") CHESTNEY
U.S. MAGISTRATE JUDGE