UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

WEALTHMARK ADVISORS
INCORPORATED and DAVID SHIELDS,
INDIVIDUALLY,

    Plaintiffs,

v.

PHOENIX LIFE INSURANCE
COMPANY and PHL VARIABLE
INSURANCE COMPANY,

    Defendants.

Civil No. SA-16-cv-00485-RCL

## OPINION AND ORDER

On January 31, 2019, a bench trial was held in this contract dispute between defendants Phoenix Life Insurance Company and PHL Variable Insurance Company ("PHL") (together, "defendants" or "Phoenix") and plaintiffs WealthMark Advisors Incorporated and David Shields (together, "plaintiffs" or "WealthMark"). The Court previously adopted the Magistrate's Report and Recommendation [ECF No. 68] and granted summary judgment in favor of PHL on the issue of liability on its breach of contract counterclaim for the return of commissions pursuant to the Repayment-of-Commissions provision of the Distributor Agreement.[1] Order Accepting R&R at 4, ECF 71. Therefore, the only issue for trial was the amount of damages Phoenix is entitled to recover on its breach of contract counterclaim. Based on all the evidence presented, the Court

---

[1] In that order, the Court also granted summary judgment such that WealthMark's request for a declaratory judgment was denied and granted summary judgment in favor of Phoenix on WealthMark's negligence claims. *See* Order Accepting R&R at 4, ECF 71.

makes the following findings of fact and conclusions of law and will, consistent with them, enter judgment in favor of Phoenix against WealthMark.

On June 9, 2010, Phoenix and WealthMark entered into the Annuity Distributor Agreement (the "Distributor Agreement") wherein Phoenix agreed to compensate WealthMark for the authorized sale of its insurance products by WealthMark's representatives according to the compensation schedules attached to the Distributor Agreement. Stipulated Facts ¶ 4, ECF 78-1; Stipulated Facts ¶ 4, ECF 79-1. In certain situations, though, a "Repayment-of-Commissions" provision in the Distributor Agreement entitled Phoenix to a return of commissions paid. Stipulated Facts ¶ 5, ECF 78-1; Stipulated Facts ¶ 5, ECF 79-1.

One of WealthMark's representatives was Anthony Friendshuh, who sold PHL's annuity products in Minnesota. Stipulated Facts ¶ 6, ECF 78-1; Stipulated Facts ¶ 6, ECF 79-1. Around 2014, the State of Minnesota began investigating Mr. Friendshuh for fraudulent practices in the sale of PHL annuity products. R&R at 3–4, ECF 68. In conjunction with that investigation, Phoenix's parent company and the Minnesota Attorney General reached a settlement providing for a rescission process for Minnesota purchasers of Phoenix's annuities through Mr. Friendshuh. *See* DX-5 (the Assurance of Discontinuance); Trial Tr. 8:14–22. Pursuant to this rescission process, over 234 annuities were rescinded (the "Rescinded Annuities") with Phoenix being forced to return over $27 million in premiums to clients of Mr. Friendshuh. DX-10. Because these contracts were held to be rescinded and not surrendered, *See* R&R at 15; Order Accepting R&R, commissions paid on the sale of the Rescinded Annuities must be repaid to Phoenix.

Phoenix paid a commission to both WealthMark and Mr. Friendshuh for the products Mr. Friendshuh sold. Trial Tr. 7:11–13. At trial, Phoenix called Nancy Turner to testify on the amount of commissions paid to WealthMark and Mr. Friendshuh and that is properly owed to Phoenix

under the "Repayment-of-Commissions" provision in the Distributor Agreement. Trial Tr. at 2:6–11. Ms. Turner is the Second Vice President of Distribution Administration at Phoenix's parent company. Trial Tr. at 2:25. As part of her job, Ms. Turner oversees payments of commissions for agents and distributors and the collection of charge backs. Trial Tr. at 3:7–10. "Charge backs" are reversals of commissions that are triggered by certain transactions, such as the rescission of a policy. Trial Tr. at 3:14–19; Trial Tr. at 7:16–24.

Phoenix keeps track of commissions and charge backs through an automated computer system called Performance Plus. Trial Tr. at 4:2–7. When an agent sells a product, such as an annuity, the new business department will enter an application into Performance Plus. Trial Tr. at 4:19–5:3. Performance Plus then automatically calculates the commission owed on that product and feeds that information to a disbursement system that either cuts a check or initiates an electronic funds transfer to the agent or distributor owed the commission. Trial Tr. at 4:19–5:3; Trial Tr. 6:1–11. Alternatively, when a rescission occurs, the post-issue department processes the rescission through the system, which determines the amount of charge back owed.[2] Trial Tr. 7:16–24. This data—both commissions and charge backs—is put into a compensation report for the agent or distributor.

At trial, Ms. Turner presented the compensation reports for both Mr. Friendshuh and WealthMark related to the Rescinded Annuities. *See* DX-10;[3] DX-11.[4] Based on these records, Phoenix paid Mr. Friendshuh $2,215,689.39 in commissions for the sale of the Rescinded Annuities with the total outstanding charge backs owed to Phoenix totaling $2,166,531.32. DX-

---

[2] For rescissions, charge backs equal the commission previously paid out. Trial Tr. 7:25–8:5.
[3] These records were properly admitted in summary form under Fed. R. Evid. 1006, as they were derived from voluminous records.
[4] These records were properly admitted in summary form under Fed. R. Evid. 1006, as they were derived from voluminous records.

3

10; Trial Tr. 26:8–10. To WealthMark, the records show Phoenix paid $392,982.35 in commissions for the sale of the Rescinded Annuities with the total outstanding charge backs owed to Phoenix totaling $383,152.75. DX-11; Trial Tr. 34:15–18. Because Phoenix has been unable to collect the charge backs owed by Mr. Friendshuh, it has transferred his debt to WealthMark, as permitted under the Distributor Agreement. *See* DX-3; DX-6. The records, therefore, demonstrate a total of $2,549,684.07 in charge backs owed to Phoenix by WealthMark.

WealthMark argues that this evidence presented by Phoenix is insufficient to meet its burden of proving damages. Trial Tr. 81:12–82:9 ("I don't think they met their burden . . . I have no reason to doubt that it was accurate that the documents show what they show but I don't think they show enough."). Specifically, WealthMark claims that there is a difference between commissions *owed* and commissions *paid*. Trial Tr. 81:24–25. Without literal proof of payment (*e.g.* checks, EFT records), WealthMark contends that Phoenix has not sufficiently proven what must be paid back. 82:5–9. This argument by WealthMark is quite the gamble, as it is supported almost entirely by suggestion and speculation. WealthMark presents no documentary evidence to support the theory that Phoenix was not paying the commissions it owed its agents and distributors and provides no damages model of its own. Such documentary evidence, if it even exists, was discoverable from Phoenix, if not already in WealthMark's possession. Instead, WealthMark relies on the burden of proof to do the heavy-lifting and reduce Phoenix's damages from over $2.5 million to $0.

Well, WealthMark's gamble did not pay off. The documentary evidence presented by Phoenix along with the testimony of Ms. Turner demonstrates to the Court by a preponderance of the evidence that the commissions on the Rescinded Annuities were paid by Phoenix to WealthMark and Mr. Friendshuh. Accordingly, under the Repayment-of-Commissions provision

of the Distributor Agreement, WealthMark is liable for breach of contract to PHL in the amount of $2,549,684.07 for the non-returned commissions PHL paid Mr. Friendshuh and Wealthmark on the Rescinded Annuities.

Additionally, Phoenix asks the Court to award prejudgment interest.[5] In this diversity case, state law governs an award of prejudgment interest. *Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 75 F.3d 1048, 1057 (5th Cir. 1996). A prevailing plaintiff in a contract case governed by Texas law is entitled to an award of prejudgment interest "in all but exceptional circumstances." *Am. Int'l Trading Corp. v. Petroleos Mexicanos*, 835 F.2d 536, 541 (5th Cir. 1987); *see also, e.g., Joy Pipe, USA, L.P. v. ISMT Ltd.*, 703 F. App'x 253, 257 (5th Cir. 2017) (per curiam) (reiterating the Fifth Circuit's interpretation that Texas law requires equitable prejudgment interest "as a matter of course, absent exceptional circumstances"). Prejudgment interest is calculated as simple interest at the state post-judgment interest rate until the day preceding the date judgment is rendered beginning the *earlier* of: (a) the 180th day after the date the defendant receives written notice of a claim; or (b) the date the suit is filed. TEX. FIN. CODE §§ 304.103, 304.104. The current post-judgment interest rate is 5.25% per annum. *See* TEX. FIN. CODE § 304.003; *Interest Rates*, OCCC (Feb. 1, 2019), https://occc.texas.gov/publications/interest-rates. The Court finds that Phoenix is entitled to recover prejudgment interest at 5.25% from the date the suit was filed, April 22, 2016, until January 21, 2019. Therefore, Phoenix is entitled to $371,869.68 in prejudgment interest.

---

[5] This is not to be confused with Phoenix's prior claim for recovery of interest payments it made pursuant to the settlement with the Minnesota Attorney General, which Phoenix has agreed to dismiss. *See* Joint Advisory Regarding Case Status, ECF 74; Trial Tr. 1–6.

Phoenix is also entitled to post-judgment interest on its damages. TEX. FIN. CODE § 304.003. A determination of entitlement to attorneys' fees and costs will be made at a later date upon motion under Fed. R. Evid. 54.

For the foregoing reasons, judgment consistent with these findings of fact and conclusions of law shall be entered for defendants. A separate judgment shall issue this date.

*Royce C. Lamberth*
Royce C. Lamberth
United States District Judge

DATE: 2/1/19